AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.

TONY HENDERSON
a/k/a "Hollywood"

## CRIMINAL COMPLAINT

CASE NUMBER: 3:06-m- 1 14 S - Mel

I, the undersigned complainant, being duly sworn, state the following is true and correct

to the best of my knowledge and belief. On or about December 10, 2005, at Macclenny, in

Baker County, in the Middle District of Florida, defendant did,

knowingly, willfully and intentionally distribute marihuana, a Schedule I controlled
Substance, the amount of marihuana being less than 50 kilograms,

in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D). Further,

certain real property located at 6195 Oakdale Lane, Macclenny, Florida, 32063, is subject to

forfeiture pursuant to Title 21, United States Code, Section 853(a)(2), as property used to

facilitate the commission of said offenses. I further state that I am a Special Agent with the

U.S. Drug Enforcement Administration, and that this Complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes   ☐ No

Signature of Complainant
FLORENTINO ROSALES
Special Agent
U.S. Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

June 6, 2006                    at        Jacksonville, Florida

MONTE C. RICHARDSON
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Florentino Rosales, being duly sworn, state as follows:

1.     I am a Special Agent with the U.S. Drug Enforcement Administration (DEA), currently assigned to the Gainesville, Florida Resident Office. I have been employed by the DEA since August 24, 1995, and I was hired in Chicago, Illinois. I graduated from the DEA Academy in Quantico, Virginia in December 1995. From May 1996 through May 1998, I was assigned to the DEA San Jose, California Resident Office. From May 1998, through October, 2003, I was assigned to the DEA Eagle Pass, Texas Resident Office. On October 20, 2003, I reported to the DEA Gainesville, Florida Resident Office. My duties as a DEA Special Agent include the investigation of Title 21 violations by illegal drug traffickers, their organizations and their associates. In investigating these violations, I have been a case agent, an undercover agent, and a contact agent for confidential sources of information, and have actively participated in the use of wire and electronic surveillance. These investigations have resulted in the issuance of federal search warrants, arrest warrants, seizure warrants, indictments and convictions of persons for federal narcotics violations. Additionally, I have had extensive training in federal narcotics laws, on topics such as asset forfeiture, money laundering, telecommunications exploitation, and other advanced agent trainings. As part of my experience, I have also spoken on numerous occasions with informants, cooperating defendants, suspects and other experienced illegal drug traffickers concerning the methods and practices of illegal drug traffickers. I have also worked numerous narcotics investigations with other law enforcement agencies, including the U.S. Customs Service, the U.S. Border Patrol, the California Highway Patrol, the San

Jose (California) Police Department, the Eagle Pass (Texas) Police Department, the Texas Highway Patrol, the Florida Highway Patrol, the Florida Department of Law Enforcement, and the Gainesville (Florida) Police Department. I am a native and fluent Spanish speaker, having been born in Mexico. I am a naturalized American citizen, and I am also fluent in English. As a DEA Special Agent, I have conducted over 1,000 interviews in Spanish of defendants, suspects, informants and other individuals involved in illegal drug trafficking. I also have participated in undercover operations conducted in Spanish, and translated over 100 recorded Spanish conversations into English. Through my training and experience, I have become familiar with the techniques and methods in which illegal drugs are often packaged, including those commonly used in the packaging of marijuana for distribution. I am also familiar with the physical appearance and odors of numerous type of illegal drugs, including marijuana.

2.     This affidavit is being submitted in support of a Criminal Complaint charging TONY HENDERSON, a/k/a "HOLLYWOOD," with knowing, willful and intentional  distribution of marijuana, a Schedule I controlled substance, the amount of the marijuana being less than 50 kilograms, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D). This affidavit does not contain all of the information pertaining to this investigation, and merely intended to provide probable cause for the filing of the attached complaint. I have personally participated in this investigation described below and am familiar with the information contained in this affidavit either through my own personal observations or those communicated to me by other law enforcement officers, conversations with other law enforcement officers, and/or reviewing reports written by other law enforcement officers.

2

3.      On December 5, 2005, DEA Special Agent (SA) Erin Desmond told me that Live Oak Police Officer (PO) Audrey P. Land[1] and Florida Department of Law Enforcement (FDLE) Special Agent (SA) Bill Pheil had a confidential source of information (the "CS") who had information regarding the marijuana trafficking activities of PEDRO FERNANDEZ and United States Border Patrol Agent TONY HENDERSON, a/k/a "HOLLYWOOD." SA Desmond also explained to me that in or about December 2004, the CS and FERNANDEZ traveled to HENDERSON's residence in Macclenny, Florida to discuss a marijuana transaction. SA Desmond also told me that, on that occasion, a female individual who identified herself as HENDERSON's wife told the CS and FERNANDEZ in substance that HENDERSON was not at the residence at that time and that HENDERSON was working elsewhere.

4.      I have reviewed the criminal history of the CS and I have discussed the the same with PO Land, who is familiar with the CS. The CS was convicted of a federal drug felony on July 29, 1985, convicted of a state charge of petit theft on January 20, 1998, adjudication was withheld on a state misdemeanor charge for failure to appear on a traffic violation on August 15, 2000, and adjudication was withheld on state misdemeanor charge of driving while license suspended on July 26, 2002. The CS has known FERNANDEZ for over five years. The Information provided by the CS in

---

[1]      PO Land is familiar with HENDERSON and has had several conversations with HENDERSON over recent years when PO Land and HENDERSON encountered each other during law enforcement activities in Suwannee County, Florida. On one occasion, HENDERSON asked PO Land to provide a letter of reference for HENDERSON in connection with a U.S. Border Patrol internal investigation. Therefore, PO Land is familiar with the sound of HENDERSON's voice.

connection with the investigation detailed in this affidavit has proven to be reliable and has been independently corroborated by me and other law enforcement officers through telephone records, physical surveillance, and audio recorded meetings between the CS and FERNANDEZ.

5.      On December 6, 2005, DEA Task Force Officer (TFO) Raymond Metrick and I traveled to Live Oak, Florida, where we met with PO Land and SA Pheil at the FDLE Office, and conducted an interview of the CS. The CS was also signed as a DEA confidential source. The CS related in substance the following information regarding FERNANDEZ and HENDERSON to TFO Metrick, PO Land, SA Pheil and me:

> A.      The CS has known FERNANDEZ, who is a Mexican male, since 2001 when the CS rented a mobile home to FERNANDEZ.   In December 2004, FERNANDEZ told the CS that HENDERSON, whom FERNANDEZ referred to as "HOLLYWOOD," had a load of marijuana that HENDERSON was trying to sell. The CS and FERNANDEZ traveled to HENDERSON's residence in Macclenny, Florida but HENDERSON was not home. The CS also called HENDERSON in an effort to arrange a marijuana transaction, but HENDERSON told the CS to have FERNANDEZ call HENDERSON. At that time, no marijuana transaction occurred.

> B.      On December 6, 2005, FERNANDEZ asked the CS if the CS had a buyer for marijuana. FERNANDEZ explained to the CS that HENDERSON had a load of marijuana and wanted to sell it for $700 per pound. On the same date, the CS overheard a telephone call between

4

FERNANDEZ and HENDERSON and heard HENDERSON tell

FERNANDEZ in substance that HENDERSON could not do the deal

(which the CS believed to be a marijuana transaction) until after 3:00 pm.

The CS heard as HENDERSON suggested to FERNANDEZ that they do

the deal on "Saturday" (which I know to be December 10, 2005). After this

telephone call, FERNANDEZ told the CS that FERNANDEZ and

HENDERSON used the word "goats" as a code word for pounds of

marijuana and that FERNANDEZ and the CS should do the same.

6.     On December 6, 2005, the CS called FERNANDEZ's cellular telephone

number (386) 209-0626, as witnessed by me, SA Pheil, TFO Metrick and PO Land, and

this call was recorded. During this call, FERNANDEZ told the CS in substance that he

(FERNANDEZ) was on his way to Mississippi. The CS asked FERNANDEZ if

FERNANDEZ was sure that FERNANDEZ would be back by Saturday, because the CS

talked to the CS's customer and the CS's customer wanted "three," referring to pounds

of marijuana. FERNANDEZ told the CS that FERNANDEZ was going to be back on

Saturday and wanted to know how many. The CS asked FERNANDEZ, "How many

does he (HOLLYWOOD) have?" FERNANDEZ replied, "He did not tell me how many

he has but he told me he has a lot, he always has fifteen, twenty, or thirty of those goats

there." FERNANDEZ asked the CS in substance if the CS's people were good and the

CS said that they are good[2]. FERNANDEZ told the CS that FERNANDEZ was going to

---

[2]     Based upon my training and experience, I know that this means
that the CS's customer(s) were trustworthy and were not working for law
enforcement.

make some money and asked if the CS was also going to give FERNANDEZ some money. The CS told FERNANDEZ that he (FERNANDEZ) was going to make some money if it was good, because the CS's customer was going to buy more if it was good. FERNANDEZ suggested to the CS to buy "one" first as a sample and that HENDERSON would bring it to town. The CS also obtained HENDERSON's cellular telephone number, (904) 219-7120, from FERNANDEZ, and the CS provided it to me.

      7.     Also on December 6, 2005, I issued DEA administrative subpoenas to Nextel for telephone toll records for telephone number (904) 219-7120, and also to Alltel for telephone toll records for telephone number (386) 209-0626. On December 7, 2005, I received the subscriber information records for both telephone numbers, and I have reviewed these records. The Alltel records revealed that cellular telephone number (386) 209-0626 was issued on November 4, 2005 to Elizabeth YAWN, 11844 State Road 51, Live Oak, Florida, home telephone number (386) 776-2931. According to the CS and PO Land, YAWN is FERNANDEZ's girlfriend. The Nextel records revealed that cellular telephone number (904) 219-7120 is subscribed to the United States Border Patrol, with billing address: Attn: Edivina Figueroa, 7201 S. Airport Road, Pembroke Pines, Florida, that this account was established on April 6, 1999, and that the account contact telephone number is (954) 965-6300. I then called telephone number (954) 965-6300, and a female individual answered and stated "U.S. Border Patrol, can I help you?" I asked, "Who is this?" and the female individual stated "This is the U.S. Border Patrol, can I help you?" I then said I had dialed the wrong telephone number and terminated the conversation.

8.      On Saturday, December 10, 2005, DEA TFO Daniel Wolfe and DEA SA Erin Desmond advised me by telephone that they established surveillance in the vicinity of HENDERSON's residence, and verified its address as 6195 Oakdale Lane, Macclenny, Florida[3].

9.      Also on December 10, 2005, at approximately 9:30 a.m., DEA Resident Agent in Charge (RAC) Jeffrey D. Yllander, DEA SA Robert H. Riley, DEA TFO Metrick, FDLE SA Pheil, PO Land, and I met with the CS in Live Oak, Florida and discussed making a controlled purchase of marijuana from FERNANDEZ and HENDERSON. The CS told us that FERNANDEZ had agreed to be at the CS's residence in Live Oak at 11:00 a.m. and that the CS and FERNANDEZ planned to call HENDERSON and discuss having HENDERSON provide FERNANDEZ and the CS with a quantity of marijuana. PO Land gave the CS an audio recorder and instructed the CS to record all conversations between the CS, FERNANDEZ and HENDERSON. The CS then departed and proceeded to the CS's residence. At approximately 10:30 a.m., TFO Wolfe and SA Desmond informed me by telephone that HENDERSON had just departed his residence at 6195 Oakdale Lane, Macclenny, Florida driving a red Toyota pickup truck and accompanied by a female individual. TFO Wolfe and SA Desmond advised in substance that they recognized HENDERSON from a picture on his Florida driver's license.

_____

[3]      The CS and PO Land had previously identified this address as HENDERSON's residence. Also, DEA SA Erin Desmond had previously checked a State of Florida Department of Highway Safety & Motor Vehicles Driver and Vehicle Information Database (DAVID) which revealed that HENDERSON's State of Florida driver's license, #H536-800-61-169-0, lists his address as 6195 Oakdale Lane, Macclenny, Florida 32063.

7

10.    Also on December 10, 2005, at approximately 11:00 a.m., SA Riley and TFO Metrick informed me by radio telephone that they observed a gold Ford Taurus arrive at the CS's residence. Shortly thereafter, SA Riley and TFO Metrick, who were conducting a "roving" surveillance, informed me by telephone that the Taurus was no longer at the CS's residence. The CS then called PO Land and me by telephone and advised us that FERNANDEZ had left the CS's residence. At approximately 11:50 a.m., the CS met with RAC Yllander, SA Riley, TFO Metrick, SA Pheil, PO Land, and me at a prearranged neutral location in Live Oak. The CS told us in substance that at approximately 11:00 a.m., the CS dialed HENDERSON's cellular telephone number (904) 219-7120 using FERNANDEZ's cellular telephone (386) 209-0626, and that the CS heard the entire conversation between HENDERSON and FERNANDEZ because FERNANDEZ's cellular telephone was set on "speaker" mode. The CS indicated that FERNANDEZ told HENDERSON that he (FERNANDEZ) needed three to four goats. The CS indicated that HENDERSON told FERNANDEZ that HENDERSON had recently lost "forty"[4] but that HENDERSON was going to call someone else to see how much he (the second source of supply) wanted for the "goats." The CS further indicated that the CS and FERNANDEZ called HENDERSON again and HENDERSON told FERNANDEZ to call back at 2:00 p.m. These conversations were recorded by the CS.

11.    I have listened to the recording of these conversations, and the recording corroborates the CS's account as given to me. Moreover, PO Land and DEA Special

---

[4]     Based upon my training and experience, as well as the context of the conversation and the impressions of the CS as communicated to me by the CS, I know that "forty" refers to 40 pounds of marijuana.

8

Agent Bruce Savell[5] have each listened to the recording, and both PO Land and SA

Savell have confirmed HENDERSON is one of the speakers as indicated.   I have set

forth a transcript of a portion of this recording below:

| | |
|---|---|
| HENDERSON: | Okay! So how many?  Three?  How many?  Four? |
| FERNANDEZ: | How many goats? |
| HENDERSON: | Yeah! |
| CS: | Three or four. |
| FERNANDEZ: | Three, four or five, whatever you can find for me! |
| HENDERSON: | There's another guy that has some that I have to go to.  I have to call you to say how much he wants.  I can't check till Monday! |
| FERNANDEZ: | Till Monday?  Can you, there is no way you can do it today? |
| HENDERSON: | That is not my guy.  It, it's another guy's.  Let me, let me call you, let me call the guy.  Let me call somebody that knows him and I'll call you back. |

---

[5]      SA Savell has advised me that SA Savell has known HENDERSON for over 10 years, and that SA Savell has had numerous personal contacts with HENDERSON while conducting routine drug interdiction activities at the Greyhound Bus station and Amtrak train station in Jacksonville, Florida.  SA Savell has also advised me that SA Savell has had numerous conversations with HENDERSON in connection with their respective law enforcement activities, and that SA Savell is very familiar with HENDERSON's physical appearance and the sound of HENDERSON's voice.

As set forth above, FERNANDEZ then called HENDERSON again:

HENDERSON:     It's going to be about two o'clock before I hear
               anything.  Don't come over here unless I tell you we
               got it.

During these conversations, FERNANDEZ referred to HENDERSON by the nickname
"HOLLYWOOD."  After meeting with me and the other law enforcement officers listed in
paragraph 9 above, the CS then returned to the CS's residence with an audio
transmitting device which was provided to the CS by me and which allowed me and
other law enforcement officers to monitor the CS's conversations as the CS met with
FERNANDEZ.

        12.     Also on December 10, 2005, at approximately 2:28 p.m., SA Riley and
TFO Metrick were in a surveillance position near the CS's residence and advised me by
radio telephone that they observed the same Ford Taurus, driven by FERNANDEZ,
arrive at the CS's residence in Live Oak.  SA Riley and TFO Metrick told me that they
observed FERNANDEZ, whom they recognized from a Florida driver's license
photograph, and that FERNANDEZ was wearing a green shirt and gray pants.

        13.     Also on December 10, 2005, at approximately 2:31 p.m., while monitoring
the audio transmitting device worn by the CS, I heard portions of the conversation
between the CS, FERNANDEZ and HENDERSON because FERNANDEZ telephoned
HENDERSON again and FERNANDEZ's cellular telephone was again set on "speaker"
mode.  During this conversation, HENDERSON told FERNANDEZ that he
(HENDERSON) had "the shit" but "the fucking cops. . . took it."  Based upon my training
and experience, the context of the conversation, I believe that this statement meant that

HENDERSON was advising FERNANDEZ that HENDERSON had had some marijuana available for distribution but that police officers had seized it.

14.    At approximately 2:38 pm, while monitoring the audio transmitting device worn by the CS, I heard as FERNANDEZ received a telephone call from HENDERSON (because FERNANDEZ's cellular telephone was again on "speaker" mode), and I heard as HENDERSON told FERNANDEZ that HENDERSON had "four."[6]  I also heard as HENDERSON told FERNANDEZ to "venga solo," which I know is Spanish for "come alone."  I also heard as FERNANDEZ told HENDERSON that FERNANDEZ would be at HENDERSON's house at four (o'clock), and I heard as HENDERSON said that that was too early and told FERNANDEZ "let's make it about six (o'clock)."

15.    I have listened to the recording of these telephone conversations which was made by the CS.  This recording also contains the conversations between the CS and FERNANDEZ which occurred before, between and after the telephone conversations between HENDERSON and FERNANDEZ.  Moreover, PO Land and DEA Special Agent Bruce Savell have each listened to the recording, and both PO Land and SA Savell have confirmed HENDERSON is one of the speakers as indicated. The recording corroborates the parts of the conversation which I heard while monitoring the audio transmitter worn by the CS.  On the recording, FERNANDEZ refers to HENDERSON as "HOLLYWOOD" on several occasions.  The recording also shows that HENDERSON told FERNANDEZ "I mean, like I said, the shit, the shit we had, the

---

[6]    Based upon my training and experience, as well as the context of the recorded conversation, I know that the term "four" referred to 4 pounds of marijuana.

fucking, the fucking cops found it and took it." Based upon my training and experience, the context of the conversation, I believe that this statement meant that HENDERSON was advising FERNANDEZ that HENDERSON had had some marijuana available for distribution but that police officers had seized it. The recording also shows that HENDERSON told FERNANDEZ, "I'm going to another guy," "[a]nd I'm just waiting on him to get back for me bro'." Based upon my training and experience, and the context of the conversation, I believe that these statements meant that HENDERSON was advising FERNANDEZ that HENDERSON was contacting another source of supply for marijuana and was waiting on a response back from this source. The recording also reveals that HENDERSON confirmed the price for each pound of marijuana which FERNANDEZ was ordering from HENDERSON, stating "It's, it's five, right?," and further that HENDERSON told FERNANDEZ that "we have forty rolling." Based upon my training and experience, and the context of the conversation, I believe that this statement meant that HENDERSON was advising that the price of the marihuana would be $500 per pound, and further that HENDERSON had 40 pounds of marijuana that was in the process of being delivered. The recording also confirms that FERNANDEZ ordered at least 5 pounds of marijuana from HENDERSON, and that HENDERSON agreed to provide it. I have set forth a transcript of a portion of this conversation below:

> FERNANDEZ:   Okay, but I'll be happy if you at least get me at least five. Okay?
>
> HENDERSON:   I'll do it, bro'.

Moreover, the recording of the second telephone conversation reveals that HENDERSON confirmed to FERNANDEZ that HENDERSON had obtained the

marijuana from a source of supply, as HENDERSON stated, "Yeah. I got four (pounds of marijuana)." The recording also reveals that HENDERSON directed FERNANDEZ to come to HENDERSON's residence (HENDERSON stated "My house.") to conduct the marijuana transaction. The recording also reveals that HENDERSON asked FERNANDEZ, "How much you gonna pay?", and that HENDERSON confirmed the price of the marijuana with FERNANDEZ, stating, "Ah, that's fine, that's fine. . . that I need, I need five." Based upon my training and experience, and the context of the conversation, I believe that this statement meant that HENDERSON needed $500 for each pound of marijuana, for a total of $2,000, because HENDERSON added, "Okay, take. . . two thousand." The recording also shows that HENDERSON directed FERNANDEZ to come alone to HENDERSON's residence, as HENDERSON stated, "Venga solo." The recording also shows that after HENDERSON terminated the telephone conversation with FERNANDEZ, the CS and FERNANDEZ discussed the amount that "HOLLYWOOD" was charging FERNANDEZ for the marijuana and the financial arrangement between HENDERSON and FERNANDEZ. Specifically, the recording shows that the CS and FERNANDEZ discussed the fact that HENDERSON was charging FERNANDEZ a total of $2,000 for the four pounds of marijuana ($500 per pound), but that the CS would have to pay $700 per pound.

16.    Also on December 10, 2005, at approximately 2:47 p.m., SA Riley and TFO Metrick were in a surveillance position near the CS's residence and advised me by telephone that they observed the same Ford Taurus, driven by FERNANDEZ, depart the CS's residence and proceed on State Road 49 and then head east on U.S Highway 90.

13

17.     Also on December 10, 2005, at approximately 3:00 p.m., the CS met with me, RAC Yllander, TFO Metrick, SA Pheil, SA Riley and PO Land.  The CS confirmed what I had heard during the telephone conversations between FERNANDEZ and HENDERSON.  The CS also told us that HENDERSON agreed to provide FERNANDEZ with four pounds of marijuana later that day at HENDERSON's residence.  The CS also told us that FERNANDEZ had told the CS that FERNANDEZ would come to the CS's residence at 5:00 p.m. to pick up the CS and travel with the CS to HENDERSON's house.

18.     Also on December 10, 2005, at approximately 5:25 p.m., SA Riley and TFO Metrick were in a surveillance position near the CS's residence and advised me by telephone that they observed the same gold Ford Taurus, driven by FERNANDEZ, arrive at the CS's residence in Live Oak.  SA Riley and TFO Metrick advised me by telephone that they observed FERNANDEZ apparently waiting for the CS outside the CS's residence.  At this time, the CS was meeting with me, RAC Yllander, SA Pheil and PO Land.

19.     Also on December 10, 2005, at approximately 5:30 p.m., SA Desmond and TFO Wolfe advised me and TFO Metrick by radio telephone that they were in a surveillance position near HENDERSON's residence located at 6195 Oakdale Lane in Macclenny, Florida and that they observed HENDERSON return to the residence driving the same red Toyota pickup truck.

20.     Also on December 10, 2005, at approximately 6:04 p.m., I met with the CS and, as witnessed by RAC Yllander, SA Pheil and PO Land, provided the CS with the sum of $2,800 in U.S. currency (official government funds), which had been previously

14

photocopied and the serial numbers on the bills had been recorded. PO Land searched the CS's vehicle for contraband and did not find any illegal narcotics or illegal items. The CS then departed the meeting location in the CS's vehicle, and was followed by SA Pheil, PO Land and RAC Yllander and me.

21.    Also on December 10, 2005, at approximately 6:15 p.m., SA Riley and TFO Metrick advised me by radio telephone that they observed the CS arrive at the CS's residence in Live Oak. At approximately 6:21 p.m., SA Riley and TFO Metrick advised me by radio telephone that they observed FERNANDEZ arrive at the CS's residence.

22.    Also on December 10, 2005, at approximately 6:22 p.m., SA Riley and TFO Metrick advised me by radio telephone that they observed the CS and FERNANDEZ depart the CS's residence in the CS's vehicle. SA Riley and TFO Metrick followed the CS and FERNANDEZ as the CS's vehicle traveled eastbound on Interstate 10, and RAC Yllander, SA Pheil, PO Land and I assisted with this surveillance in separate vehicles. During this time, I listened to the audio transmitting device which the CS was wearing, and I heard, among other things, FERNANDEZ ask the CS if the "CS had all the money for $700 each, because that's what he (HENDERSON) wants, $500 for his contact and $200 for HOLLYWOOD." Most of the conversation between the CS and FERNANDEZ which occurred while in route to HENDERSON's residence was recorded on audio, however, shortly before the CS and FERNANDEZ reached HENDERSON's residence, the capacity of the memory of the audio recording device was filled and the audio recording ceased.

23.    Also on December 10, 2005, at approximately 7:21 p.m., SA Desmond

15

and TFO Wolfe advised me by radio telephone that they observed the CS and

FERNANDEZ arrive at HENDERSON's residence located at 6195 Oakdale Lane in

Macclenny, Florida. SA Riley and I followed the CS and FERNANDEZ until the CS's

vehicle turned on Oakdale Lane and approached HENDERSON's residence.

     24.    TFO Wolfe has advised me that TFO Wolfe concealed himself in a

position near HENDERSON's residence so that TFO Wolfe could observe the

transaction between HENDERSON and FERNANDEZ. TFO Wolfe advised me that

TFO Wolfe observed HENDERSON exit the front door of his residence and meet with

FERNANDEZ while the CS remained inside the CS's vehicle. TFO Wolfe advised me

that HENDERSON greeted FERNANDEZ in both Spanish and English. TFO Wolfe

advised me that TFO Wolfe heard HENDERSON ask FERNANDEZ, "Are you by

yourself?", and that FERNANDEZ replied "yes." TFO Wolfe also advised me that TFO

Wolfe heard HENDERSON tell FERNANDEZ, "You know what we got to do!"[7] TFO

Wolfe also advised me that he then observed HENDERSON and FERNANDEZ near

HENDERSON's official U.S. Border Patrol vehicle and that HENDERSON opened the

rear door of the Border Patrol vehicle. TFO Wolfe also advised me that TFO Wolfe then

observed HENDERSON and FERNANDEZ walk behind the residence and out of TFO

Wolfe's line of sight, and that TFO Wolfe observed HENDERSON and FERNANDEZ

return from behind the residence a few minutes later. TFO Wolfe also advised me that

_____

       [7]     Based upon my training and experience, including my familiarity
with the practices of illegal drug traffickers, I believe that HENDERSON was
indicating to FERNANDEZ that HENDERSON would have to pat down
FERNANDEZ to ensure that FERNANDEZ was not wearing any concealed
recording devices.

TFO Wolfe observed HENDERSON return to the rear of the Border Patrol vehicle, placed something inside the vehicle, and close the rear door of the vehicle, while FERNANDEZ returned to the CS's vehicle. TFO Wolfe also advised me that TFO Wolfe heard HENDERSON tell FERNANDEZ at the end of their meeting: "Call me tomorrow and let me know how it goes."

25.    TFO Wolfe advised me that TFO Wolfe attempted to capture the meeting between HENDERSON and FERNANDEZ on video using a handheld video recorder. I have reviewed the video recording of this meeting. Because the meeting occurred after dusk and the lighting conditions were poor, the video recording does not capture the actual exchange of marijuana and money between HENDERSON and FERNANDEZ. However, the video recording does show the conclusion of the meeting, it captures on audio HENDERSON saying "Call me tomorrow and let me know how it goes," and it depicts HENDERSON reentering his residence after the meeting. PO Land and SA Savell have each listened to and watched the audio and video portions of this recording, and both PO Land and SA Savell have confirmed HENDERSON is the speaker as indicated above and that HENDERSON is captured on the video.

26.    At approximately 7:35 p.m., SA Desmond informed me, RAC Yllander, SA Pheil, SA Riley, TFO Metrick and PO Land by radio telephone that the meeting between the CS, FERNANDEZ and HENDERSON was ending. A short time later, I saw the CS's vehicle pass my surveillance location near HENDERSON's residence, and I followed the CS's vehicle in my vehicle. The CS and FERNANDEZ then stopped at the Citgo gas station and convenience store located approximately one mile from HENDERSON's residence. RAC Yllander, SA Riley and TFO Metrick advised me by radio telephone

17

that they observed FERNANDEZ exit the CS's car and enter the Citgo convenience store.

27.     At approximately 7:42 p.m., RAC Yllander (who was alone in a vehicle), SA Riley and TFO Metrick (who were together in a different vehicle) and I (alone in a different vehicle) observed FERNANDEZ exit the Citgo convenience store and reenter the CS's vehicle. The CS and FERNANDEZ then departed the Citgo convenience store parking lot, and proceeded east on U.S. Highway 90 and then turned west onto Interstate Highway 10, followed by the agents and officers listed above.

28.     At approximately 8:38 p.m., SA Riley and TFO Metrick advised me by radio telephone that they observed the CS and FERNANDEZ arrive at the CS's residence in Live Oak, and shortly thereafter, they observed FERNANDEZ depart the CS's residence in the gold Ford Taurus. TFO Metrick advised me that the CS remained in the CS's vehicle, that the vehicle remained stationary for several minutes, and then the CS departed the residence in the CS's vehicle followed by PO Land (who was alone in a vehicle), and TFO Metrick and SA Riley.

29.     At approximately 9:00 p.m., the CS met at a prearranged location with RAC Yllander, SA Pheil (who arrived in a separate vehicle), PO Land, TFO Metrick, SA Riley and me. The CS relinquished a brown paper "Target" shopping bag with handles to me and PO Land, as witnessed by RAC Yllander, SA Pheil, TFO Metrick and SA Riley. PO Land looked inside the brown "Target" bag and observed another plastic shopping bag which contained three blue plastic Ziploc bags, each containing a quantity of marijuana. I and the other agents and officer listed above also observed the marihuana and its packaging. The CS returned $700 in U.S. currency which was the

18

remainder of the original $2,800 in U.S. currency provided to the CS for this marijuana transaction, because HENDERSON only sold three pounds of marijuana to FERNANDEZ, for a total cost of $2,100.  TFO Metrick and PO Land searched the CS and the CS's vehicle and did not locate any additional contraband or U.S. currency. The CS also gave PO Land the audio recording of the conversation between the CS and FERNANDEZ that occurred during the travel to and from HENDERSON's residence that day.  SA Riley and I took custody of the brown "Target" bag containing the plastic bag and the three plastic Ziploc bags of marijuana, and later secured these items at the DEA Gainesville Residence Office for evidentiary purposes.

30.     TFO Metrick, PO Land and I interviewed the CS regarding the trip with FERNANDEZ to HENDERSON'S residence, and the CS advised us of the following:

FERNANDEZ told the CS that doing business with HENDERSON was a "sure thing" and that HENDERSON also sells INS work permits to immigrants for $2000 and can obtain driver's licenses as well. FERNANDEZ told the CS that HENDERSON has taken Mexican citizens' identity documents such as birth certificates and used them to obtain work permits.  Upon their arrival at HENDERSON's residence earlier on December 10, 2005, the CS parked the CS's vehicle in the driveway on HENDERSON's property close to HENDERSON's U.S. Border Patrol sport utility vehicle.  The CS gave FERNANDEZ the $2,800 in U.S. currency (which had been given to the CS by me earlier) to use to purchase the marijuana from HENDERSON.  When they arrived, the CS and FERNANDEZ observed HENDERSON standing in the front porch of

19

HENDERSON's residence.  FERNANDEZ exited the CS's vehicle and met with HENDERSON, while the CS remained inside the CS's vehicle.  The CS overheard some of the conversation between FERNANDEZ and HENDERSON during the marijuana transaction.  FERNANDEZ told HENDERSON that every time HENDERSON has "something," which the CS believed to mean marijuana, HENDERSON should call FERNANDEZ.  HENDERSON asked FERNANDEZ if FERNANDEZ could move a lot, which the CS believed meant to sell a lot of marijuana, and FERNANDEZ stated that FERNANDEZ could do it.  The CS observed HENDERSON open the rear door of the U.S. Border Patrol vehicle in the driveway of HENDERSON's residence and saw FERNANDEZ retrieve the brown "Target" shopping bag that contained the plastic bags containing marijuana.  The CS heard HENDERSON tell FERNANDEZ to call HENDERSON the next day.  When the CS and FERNANDEZ stopped at the Citgo convenience, FERNANDEZ gave $700 back to the CS because HENDERSON only provided FERNANDEZ with three pounds of marijuana, instead of the agreed upon four pounds.

31.    On December 12, 2005, TFO Metrick and I retrieved the three Ziploc bags of marijuana which had been obtained from HENDERSON through FERNANDEZ from the evidence locker, weighed and labeled the marijuana and put it into evidence as Drug Exhibit 1 at the DEA Gainesville Resident Office.  The three Ziploc bags had gross weights of 450.4 grams, 451.5 grams and 452.4 grams, respectively, for a total gross weight of 1,354.3 grams.  DEA SA Wayne Andrews field tested the suspected

marijuana in my presence, and I observed that it field tested positive for marijuana. I then submitted Exhibit 1 to the DEA Southeast Laboratory in Miami, Florida for analysis. I have since obtained the DEA laboratory analysis results for Exhibit 1, and it was determined by DEA forensic chemist Manuel Alberto Febo that Exhibit 1 is marijuana and that its net weight (that is, without packaging) is 1313 grams. I also requested that the DEA Southeast Laboratory conduct an analysis of the brown "Target" bag, the plastic bag, and the three Ziploc bags for latent fingerprints. This examination was completed and no latent fingerprints of value for comparison purposes were developed on any of these items.

32.     On or about December 11, 2005, PO Land and I instructed the CS to call FERNANDEZ and tell FERNANDEZ the marijuana was not good quality and that it was old, and further that HENDERSON had to produce better quality marijuana. The CS told FERNANDEZ this, and FERNANDEZ told the CS that FERNANDEZ was going to Mississippi, would return the weekend of December 17, 2005 and would call HENDERSON.

33.     On December 27, 2005, I received a phone call from the CS, and the CS told me that on December 24, 2005, FERNANDEZ met the CS at the CS's residence in Live Oak. The CS advised me that FERNANDEZ told the CS that HENDERSON had called FERNANDEZ's residence and told FERNANDEZ's wife, "Tell Pedro to call HOLLYWOOD." The CS advised that the CS and FERNANDEZ called HENDERSON at telephone number (904) 219-7120 from the CS's home telephone number (386) 362-7869, that no one answered, and that the CS and FERNANDEZ left a message for HENDERSON to return the phone call. The CS and FERNANDEZ also called

21

HENDERSON from the CS's cellular telephone number (386) 688-6072, and left a message to call back. The CS recorded these conversations and turned over the recording to PO Land, who then transferred custody to TFO Metrick and me.

34. The CS told me and TFO Metrick that on December 26, 2005, HENDERSON called the CS's home telephone and stated "Is that girl still there?" The CS advised me that the CS understood this to mean that HENDERSON thought he (HENDERSON) was calling FERNANDEZ. The CS further advised me that the CS told HENDERSON that FERNANDEZ had just left the CS's residence and the CS provided HENDERSON with FERNANDEZ's new cellular telephone number (386) 688-6326.

35. The CS told me and TFO Metrick that, later the same day, FERNANDEZ called the CS and said that FERNANDEZ had spoken to HENDERSON, and that HENDERSON had advised FERNANDEZ that HENDERSON was in Panama City, Florida on vacation and was therefore unable to call FERNANDEZ back. The CS advised me that FERNANDEZ also told the CS that HENDERSON had "something" but FERNANDEZ had to go to Mississippi the same day and would return on the weekend of December 31, 2005. The CS advised that FERNANDEZ also told the CS that FERNANDEZ had a source for marijuana in Mississippi, and gave the CS his (the source's) name and telephone number.

36. On January 12, 2006, TFO Metrick and I met with the CS in Live Oak and at approximately 11:14 am, the CS, at my direction, called HENDERSON at telephone number (904) 219-7120 from telephone number (386) 362-7869. I listened to this conversation while the CS and HENDERSON were talking, and I recorded this conversation on audio. Moreover, PO Land and SA Savell have each listened to the

22

recording, and both have confirmed HENDERSON is one of the speakers as indicated. HENDERSON answered the telephone and the CS asked if he had spoken with "Pedro." HENDERSON replied: "Yeah, he called me yesterday, he is in Mississippi." The CS asked if it was possible to meet with him (HENDERSON), and HENDERSON told the CS that it was better to get with "Pedro" (FERNANDEZ). The CS then explained to HENDERSON that "Pedro" has been promising to get with HENDERSON, but that "Pedro" keeps going to Mississippi. The CS also told HENDERSON that "Pedro" knows a person who is selling "goats" (marijuana) in Mississippi and wants the CS to buy from him, but the CS does not want to do that. HENDERSON told the CS that the CS will have no more problems with that and that HENDERSON will tell "Pedro" to "stop fucking around and will get on his ass to do it." The CS asked HENDERSON if he had the CS's telephone number and HENDERSON said "yes" and that he (HENDERSON) would call the CS. The CS asked HENDERSON if the CS could meet with HENDERSON and HENDERSON said that it was better to get with "Pedro."

37.     On January 26, 2006, DEA TFO Conrad Hellwege and I traveled to Live Oak and met with the CS. I instructed the CS to call HENDERSON at (904) 219-7120 and ask if FERNANDEZ had called the CS earlier. At approximately 5:52 p.m., the CS called HENDERSON at (904) 219-7120 and HENDERSON answered. The CS told HENDERSON that the CS had not called HENDERSON in a while because the CS had been working overtime and had not been at home. The CS also told HENDERSON that the CS did not know if HENDERSON or "Pedro" called the CS because the CS does not have Caller ID (which I know to be a telephone service which allows a customer to identify the name and/or telephone number of a caller). HENDERSON told the CS that

23

HENDERSON had talked to "Pedro" and "Pedro" was supposed to talk to the CS. HENDERSON told the CS that HENDERSON did not have any "goats" and that is what HENDERSON was waiting on before HENDERSON called the CS. The CS asked HENDERSON if HENDERSON had any idea and HENDERSON said it could be a week and that's the way it always works. The CS asked HENDERSON if HENDERSON had the CS's home telephone number and HENDERSON stated that HENDERSON had it on his telephone. The CS told HENDERSON that the CS would call HENDERSON on the following day to provide the CS's cellular telephone number. This conversation was audio recorded by TFO Hellwege, and I have listened to this conversation between the CS and HENDERSON. Moreover, PO Land and SA Savell have each listened to the recording, and both have confirmed that HENDERSON is the other speaker (other than the CS).

38.     On April 13, 2006, I served a subpoena on Nextel for the telephone toll records for cellular telephone number (904) 219-7120 and a subpoena on Alltel for telephone toll records for cellular telephone number (386) 209-0626. On April 27, 2006, I received the Alltel toll information for telephone number (386) 209-0626. I have reviewed this information, and I have learned that the following are the dates and times that FERNANDEZ's cellular telephone number (386) 209-0626 made calls to or received calls from telephone numbers (904) 219-7120 (which is HENDERSON's telephone number) and (386) 362-7869 (which is the CS's telephone number):

| | | | | |
|---|---|---|---|---|
| 12/06/2005 | 8:24 am | Live Oak, FL | (386) 362-7869 | 1 minute |
| 12/06/2005 | 8:25 am | Incoming | (386) 362-7869 | 1 minute |

24

| | | | | |
|---|---|---|---|---|
| 12/06/2005 | 9:59 am | Incoming | (386) 362-7869 | 3 minutes |
| 12/06/2005 | 10:15 am | Jacksonville, FL | (904) 219-7120 | 3 minutes |
| 12/09/2005 | 11:57 am | Incoming | (386) 362-7869 | 2 minutes |
| 12/09/2005 | 7:20 pm | Incoming | (386) 362-7869 | 2 minutes |
| 12/10/2005 | 9:17 am | Jacksonville, FL | (904) 219-7120 | 2 minutes |
| 12/10/2005 | 10:38 am | Incoming | (386) 362-7869 | 1 minute |
| 12/10/2005 | 10:55 am | Jacksonville, FL | (904) 219-7120 | 2 minutes |
| 12/10/2005 | 11:28 am | Jacksonville, FL | (904) 219-7120 | 1 minute |
| 12/10/2005 | 2:11 pm | Incoming | (386) 362-7869 | 1 minute |
| 12/10/2005 | 2:33 pm | Jacksonville, FL | (904) 219-7120 | 2 minutes |
| 12/10/2005 | 2:40 pm | Incoming | (904) 219-7120 | 2 minutes |
| 12/10/2005 | 6:14 pm | Incoming | (386) 362-7869 | 1 minute |
| 12/11/2005 | 5:46 pm | Incoming | (386) 362-7869 | 5 minutes |
| 12/14/2005 | 5:07 pm | Incoming | (386) 362-7869 | 3 minutes |
| 12/15/2005 | 4:35 pm | Incoming | (386) 362-7869 | 3 minutes |

39.     On April 13, 2006, I served a subpoena on Nextel for the telephone toll records for cellular telephone number (904) 219-7120.  On May 9, 2006, I received the Nextel toll information for telephone number (904) 219-7120.  I have reviewed this information, and I have learned that the following are some of the dates and times[8] that HENDERSON's cellular telephone number (904) 219-7120 made calls to or received calls from telephone numbers (386) 209-0626 and (386) 688-6326 (which are

---

[8]      The telephone toll records which I received do not show that two telephone calls between Henderson and Fernandez which occurred at approximately 2:33 p.m. and 2:40 p.m., respectively, on December 10, 2005 that are referenced above in paragraphs 13 and 14.  However, these calls are listed on the telephone toll information from FERNANDEZ's cellular telephone number (386) 209-0626 referenced above in paragraph 38.

FERNANDEZ's cellular telephone numbers), telephone number (386) 776-2293 (which is FERNANDEZ's home telephone number), telephone number (386) 362-7869 (which is the CS's telephone number), and telephone number (386) 590-7971 (which is the CS's cellular telephone number):

| | | | | |
|---|---|---|---|---|
| 11/23/2005 | 9:59 am | Outbound | (386) 776-2293 | 0 sec |
| 12/05/2005 | 4:29 pm | Outbound | (386) 776-2293 | 281 sec |
| 12/02/2005 | 10:17 am | Inbound | (386) 209-0626 | 113 sec |
| 12/10/2005 | 9:00 am | Inbound | (386) 209-0626 | 80 sec |
| 12/10/2005 | 10:57 am | Inbound | (386) 209-0626 | 77 sec |
| 12/10/2005 | 6:27 pm | Outbound | (386) 776-2293 | 32 sec |
| 12/12/2005 | 6:06 pm | Outbound | (386) 776-2293 | 0 sec |
| 12/22/2005 | 12:39 pm | Outbound | (386) 776-2293 | 693 sec |
| 12/26/2005 | 10:32 am | Outbound | (386) 362-7869 | 77 sec |
| 12/26/2005 | 10:33 am | Outbound | (386) 688-6826 | 0 sec |
| 12/26/2005 | 10:34 am | Outbound | (386) 362-7869 | 30 sec |
| 12/26/2005 | 10:34 am | Outbound | (386) 688-6326 | 0 sec |
| 12/26/2005 | 10:39 am | Inbound | (386) 688-6326 | 86 sec |
| 01/11/2006 | 12:09 am | Inbound | (386) 688-6326 | 85 sec |
| 01/27/2006 | 11:29 am | Inbound | (386) 590-7971 | 35 sec |
| 02/09/2006 | 9:23 am | Inbound | (386) 590-7971 | 0 sec |
| 03/08/2006 | 4:29 pm | Inbound | (386) 590-7971 | 12 sec |
| 03/08/2006 | 4:30 pm | Inbound | (386) 590-7971 | 13 sec |
| 03/08/2006 | 4:51 pm | Inbound | (386) 590-7971 | 12 sec |

40.     I performed a criminal history records check on Pedro FERNANDEZ, which revealed FERNANDEZ has been previously deported to Mexico by the Immigration and Naturalization Service, INS.  Immigration and Customs Enforcement, Office of Inspector General, Special Agent James De Palma retrieved FERNANDEZ's immigration file (which I know is often referred to as an "A-file") and sent it to me.  I have reviewed FERNANDEZ's A-file, which reveals that FERNANDEZ is an illegal alien, a citizen of Mexico, and was voluntarily deported to Mexico on March 30, 1978, February 20, 1979 and February 10, 1983.  The A-file also shows that on March 5, 1984, a Warrant and Order for Deportation was issued for FERNANDEZ, and he was deported to Mexico the same day.  FERNANDEZ's A-file also shows FERNANDEZ has falsely claimed to have been born in the state of Texas.  I have also determined from records checks that FERNANDEZ has Florida driver's license F655-660-52-464-0, which incorrectly states FERNANDEZ was born in Texas.

41.     SA De Palma told me that he has reviewed certain U.S. Department of Homeland Security records which show that TONY HENDERSON, a/k/a "HOLLYWOOD," is a U.S. Border Patrol Agent currently assigned to the U.S. Border Patrol office in Jacksonville, Florida.  The CS and TFO Wolfe have both positively identified HENDERSON from a State of Florida Department of Highway Safety & Motor Vehicles Driver and Vehicle Information Database (DAVID) photograph which I showed them.  HENDERSON's State of Florida driver's license, #H536-800-61-169-0, lists his address as 6195 Oakdale Lane, Macclenny, Florida 32063.  I have confirmed that this is the same address where the CS and Pedro FERNANDEZ obtained three pounds of marijuana from HENDERSON for $2,100 on December 10, 2005.

27

42.     Based on the information listed above, I have probable cause to believe
that on December 10, 2005, at Macclenny, in Baker County, in the Middle District of
Florida, TONY HENDERSON, a/k/a "HOLLYWOOD," did knowingly, willfully and
intentionally distribute marijuana, a Schedule I controlled substance, the amount of the
marijuana being less than 50 kilograms, in violation of Title 21, United States Code,
Sections 841(a)(1) and 841(b)(1)(D).

FLORENTINO ROSALES
Special Agent
U.S. Drug Enforcement Administration

Sworn and subscribed before me on this 6 day of June, 2006.

MONTE C. RICHARDSON
United States Magistrate Judge

28