IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,     Jacksonville, Florida

      Plaintiff,        Case No. 3:06-cr-211(S2)-J-32TEM

 vs.              May 16, 2011

TONY HENDERSON,        2:07 p.m.
a/k/a "Hollywood",
                Courtroom No. 5B
      Defendant.
_____

DIGITALLY RECORDED EVIDENTIARY HEARING
BEFORE THE HONORABLE THOMAS E. MORRIS
UNITED STATES MAGISTRATE JUDGE

GOVERNMENT COUNSEL:

      **RUSSELL C. STODDARD, ESQ.**
      United States Attorney's Office
      300 North Hogan Street, Suite 700
      Jacksonville, Florida  32202

DEFENSE COUNSEL:

      **TONY HENDERSON, PRO SE**


COURT REPORTER:

      Shannon M. Bishop, RMR, CRR
      221 North Hogan Street, #150
      Jacksonville, Florida 32202
      Telephone:  (904)549-1307  Fax:  (904)301-6844
      dsmabishop@yahoo.com


(Proceedings reported by microprocessor stenography;
transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE DEFENDANT:

**TONY HENDERSON**

Direct Examination.................................  5
Cross-Examination................................. 25

# E X H I B I T S   R E C E I V E D

Page No.

Defendant's Exhibits:

Nos. 1 through 15.................................  28

P R O C E E D I N G S

May 16, 2011                                              2:07 p.m.

                              - - -

            COURT SECURITY OFFICER:  Please be seated.

            THE COURT:  All right.  Good afternoon.  We're here
on case 3:06-cr-211-J-32TEM.  Actually, it's -- I think it was
(S2) at one point -- 211(S2)-J-32TEM, *United States versus
Tony Henderson*.

            Mr. Henderson has filed a petition -- or a motion
for return of disposition of property, which was document 155.
And then, more recently, a renewed motion, which is document
165, which contains a little more factual information.

            And the United States did file a memorandum in
opposition to the return of the property.

            For the United States, we have Mr. Russell Stoddard,
Assistant U.S. Attorney, and Janet Pellicciotti, of the FBI,
present.

            And this was set for an evidentiary hearing and
argument as to the property.

            Mr. Stoddard, is it still the United States'
position that the property cannot or should not be returned or
disposed of in any way that Mr. Henderson seeks?

            MR. STODDARD:  That is correct, Your Honor.  And
that is the position that we outlined in our response.  I
believe it's document No. 159 on the docket.

1           THE COURT:  Yes.

2           Mr. Henderson, you're representing yourself in this

3 matter?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Okay.  It's sort of -- it's an

6 interesting issue.  I've, of course, done legal research.  The

7 parties have each cited cases.

8           And there are some district courts or circuits in

9 the country which have allowed disposition of firearms to

10 the -- at the direction, I guess, or to the benefit of the

11 person who is -- they've been seized from or surrendered.

12           I would need to develop a little evidence in this

13 case.  I've, of course, got the pleadings, but I've never seen

14 the notice of seizure that the FBI apparently sent you at some

15 point.

16           Do you have a copy of that?

17           THE DEFENDANT:  Yes, I do, Your Honor.

18           THE COURT:  All right.  Do you want to -- how do you

19 want to proceed, Mr. Henderson?  Do you want to -- I need to

20 get this under oath, I guess.  You're going to need to testify

21 probably.

22           Are you willing to do that?

23           THE DEFENDANT:  Whatever you say, Your Honor.

24           THE COURT:  All right.  Let's place Mr. Henderson

25 under oath.

1      COURTROOM DEPUTY:  Do you solemnly swear the

2  statements you're about to give before this court will be the

3  truth, the whole truth, and nothing but the truth, so help you

4  God?

5      THE DEFENDANT:  Yes, I do.

6      COURTROOM DEPUTY:  Thank you.

7                      **TONY HENDERSON,**

8  having been produced and first duly sworn as a witness,

9  testified as follows:

10                     **DIRECT EXAMINATION**

11     THE COURT:  And, for the record, the United States

12  is relying on the *Howell* case, I believe, from the Eleventh

13  Circuit?  At least that's one of the primary authorities?

14     MR. STODDARD:  That is -- that is correct.

15     THE COURT:  And, of course, that refers under Rule

16  41(g) for seized property, pursuant to a search warrant, I

17  guess.

18      This was never seized pursuant to a search warrant,

19  so we'll see what the notice of seizure says.  Because I'm not

20  clear what -- we're really under 41(g) or not, but...

21      Mr. Henderson, do you want to take the stand, I

22  guess, and take your documents up there?

23      Do you have copies of them for the court?

24     THE DEFENDANT:  Yes.  Yes, I do, Your Honor.

25     THE COURT:  Okay.

1          (Judge confers with the courtroom deputy.)

2          THE COURT:  Yes.  If you have them -- anything you

3   intend to introduce today, if you could give that to my

4   courtroom deputy, or the CSO.

5          THE DEFENDANT:  Oh, okay.  I have the -- I have the

6   exhibits.  I can give you all the exhibits or I can just wait

7   to see what y'all don't have -- what you don't have.  Or

8   however you want to do it.

9          THE COURT:  All right.  Why don't you just take them

10  up there with you to the stand, and we'll -- we'll go by one

11  by one and have them identified what we're referring to.

12          And, for the record, Mr. Rosier is not present

13  today?

14          THE DEFENDANT:  No, he is not, Your Honor.

15          THE COURT:  Okay.  All right.  Let's see what we can

16  stipulate to, to begin with.  I think it's uncontradicted that

17  when you were released on bond by Judge Richardson he ordered

18  you to surrender the firearms -- I believe to some federal

19  agency, either DEA or some other federal agency.

20          You chose to surrender them to the FBI; is that

21  correct?

22          THE DEFENDANT:  That's correct, Your Honor.

23          THE COURT:  And that was done on June 6th -- pardon

24  me, June 9th of 2006?

25          THE DEFENDANT:  That's correct, Your Honor.

1          THE COURT:  And then your case proceeded -- it's my

2    understanding you pled guilty to a count in the second

3    superseding indictment on -- it may have been early December

4    of 2007?

5          THE DEFENDANT:  September 20th, 2007, I believe,

6    Your Honor.

7          THE COURT:  September 20th, 2007?  And there was an

8    order, document 120 -- well, the plea agreement was 128 in the

9    case, I believe.  And that was filed on November 30th of 2007.

10          THE DEFENDANT:  The plea agreement?

11          THE COURT:  Yes, according to the docket sheet.

12          THE DEFENDANT:  Yes.

13          THE COURT:  And it appears the change of plea

14    proceeding was on November 30th of 2007.

15          THE DEFENDANT:  That's correct, Your Honor.

16          THE COURT:  Okay.  And then you were adjudicated

17    guilty by Judge Corrigan on December 6th of 2007.  Is that

18    correct?

19          THE DEFENDANT:  I was sentenced on April 21st.

20          THE COURT:  Right.  But there was a separate order,

21    document No. 129, that's called acceptance of plea and

22    adjudication of guilt as to Count Five of the second

23    superseding indictment.

24          THE DEFENDANT:  That's correct, Your Honor.

25          THE COURT:  And then you were sentenced on April

24th of 2008.  And I believe you received a six-month sentence
followed by a supervised release?

THE DEFENDANT:  24 months supervised release,
including four months on home detention.

THE COURT:  Okay.  Do you recall when you were
released from prison or incarceration?

THE DEFENDANT:  It was December.

THE COURT:  Of 2008?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And, Mr. Stoddard, if you disagree with
any of this, just speak up.  I'm just trying to cut to the
important parts at some point.

Now, you indicated in your renewed motion for
disposition of property that you contacted the FBI -- this is
in document 165 -- in November of 2008.  So that would have
been while you were still in prison, or on home detention?

THE DEFENDANT:  That was an error, Your Honor.  That
was supposed to be December.

THE COURT:  It should be December?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So December of 2008, after you were
released from --

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  -- incarceration, you contacted the FBI?

THE DEFENDANT:  That is correct.

1          THE COURT:  And was that local?  Or do you know who

2    you talked to?

3          THE DEFENDANT:  It was the agent on duty.

4          THE COURT:  Here in Jacksonville?

5          THE DEFENDANT:  That's correct, Your Honor.

6          THE COURT:  And he told you to file the copy of the

7    bill of sale, along with a letter?

8          THE DEFENDANT:  Yes.  Can I say something?

9          THE COURT:  Yes.

10         THE DEFENDANT:  Prior to that, on June 13th of 2008,

11   while I was still incarcerated, Mr. Rosenblum wrote a letter

12   to the U.S. Attorney's Office -- U.S. Attorney Stoddard

13   inquiring about the firearms.

14         Mr. Rosenblum asked for which steps that would be

15   needed to be taken to transfer the firearms.  And I have a

16   copy of that letter.  And we never received any correspondence

17   back.

18         THE COURT:  All right.  Do you want to have that

19   letter marked as Exhibit No. -- Defense Exhibit No. 1?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Okay.  And then afterward you say you

22   never received any further correspondence back.  I'll let you

23   find that first.

24         (Judge confers with the courtroom deputy.)

25         THE COURT:  We need to give one to Mr. Stoddard too,

1  yes.

2          Defense Exhibit No. 1.  Yeah.  All right.

3          This doesn't have the attached list, but that's -- I

4  think you've had that attached to something else earlier.

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  And I don't think the list is in

7  dispute, so -- all right.  What happened after that, then?

8  What's the next thing that occurred with relation to the

9  firearms?

10          THE DEFENDANT:  Okay.  Do you want me to start at

11  the beginning?  Or do you --

12          THE COURT:  Well, yeah, whatever you're most

13  comfortable with.  I was just trying to --

14          THE DEFENDANT:  Okay.

15          THE COURT:  Go ahead.

16          THE DEFENDANT:  I filed the motion for the

17  disposition of property on February the 2nd, 2011.  That

18  motion seeks the restoration of the non-possessory interest in

19  the property pursuant to the *U.S. versus Edward L. Brown and*

20  *Elaine A. Brown* case, April 9, 2010.

21          I'd like to -- Your Honor, I'd like to lay out --

22  first I'd like to lay out, like, a timeline --

23          THE COURT:  Yes.

24          THE DEFENDANT:  -- if that would be possible.  And

25  then --

1          THE COURT:  Certainly.

2          THE DEFENDANT:  -- go into the points.

3          THE COURT:  Okay.

4          THE DEFENDANT:  On June 7th I was arrested as a

5    result of a warrant and criminal complaint issued in the

6    Middle District of Florida, charging me with knowingly and

7    willfully and intentionally for the distribution of marijuana,

8    Scheduled I, controlled substance, the amount of marijuana

9    being less than 50 kilograms, in violation of Title 21,

10   U.S.C. -- Code, 841(a)(1) and 841(b)(1)(D).

11         THE COURT:  Now, the indictments and things of that

12   nature are already in the court files, so I don't need copies

13   of those.

14         THE DEFENDANT:  Okay, Your Honor.  On June 7th, I

15   appeared before Judge Monte Richardson, where bond conditions

16   were set.

17         One of the conditions was the bond -- as indicated

18   on page two, paragraph four, was defendant was required to

19   immediately surrender all firearms, all law enforcement

20   firearms, and credentials to the DEA or any other authorized

21   federal agency.

22         In addition to all firearms, I voluntarily

23   surrendered 19 personal firearms to the FBI for safekeeping as

24   a condition of the bond while the charges were pending against

25   me, and, also, the fact that the judge had a concern over my

1  mental health and safety, for my concern over my family and
2  myself.  At that time the judge felt that I was a suicide
3  risk.

4  On June 9th, FBI agents Janet Pellicciotti and
5  Douglas Mathews met with me and my attorney, Alex Christine,
6  at my residence located at 6195 Oakdale Lane, Macclenny,
7  Florida 32063.  I voluntarily turned over all the firearms
8  noted on form FD-597 and FD-302.

9  Do you have a copy of that, Your Honor, or...

10  THE COURT:  The form where you surrendered the
11  firearms?

12  THE DEFENDANT:  Yes.  Or do you want me --

13  THE COURT:  I don't believe I do.

14  THE DEFENDANT:  I'd like to note on -- after the
15  cover sheet on page one, on the right-hand corner, the items
16  listed below were received from me and turned over to the FBI.

17  On September 20th, I was indicted on a superseding
18  indictment.  November 30th, pursuant to written plea
19  agreement, I entered a plea of guilty to Count Five of the
20  second superseding indictment.  Count Five charged me with
21  distribution of marijuana, violation 21, U.S.C. -- Code,
22  Section 841(a)(1) and 841(b)(1)(D).

23  I'd like to make a -- several points about the plea
24  agreement.

25  THE COURT:  Yes.

1          THE DEFENDANT:  On the -- on the terms I entered a
2    plea of guilty to Count Five of the superseding indictment
3    charging me with distribution of marijuana, a Schedule I
4    substance, the amount of marijuana being less than 50
5    kilograms, in violation of 21, U.S.C., 841(a)(1) and
6    841(b)(1)(D).
7          The maximum penalty possible, up to five years
8    imprisonment, $250,000, or both -- imprisonment.  A supervised
9    release of two years.  A special assessment of $100.
10          As far as the elements of the offense, I understood
11   the nature and the elements of the offense which I had been
12   charged with pleading guilty to.
13          Counts dismissed at the time of sentencing, the --
14   Counts One, Two, Three, Four, Six, Seven, Eight, Nine, Ten,
15   and Eleven were dismissed.
16          Item five, no further charges.  The United States
17   Attorney's Office agrees no other charges of defendant
18   committing any other federal criminal offense known in the
19   United States Attorney's Office at this time in the execution
20   of this agreement related to conducting [sic] giving rise to
21   this plea agreement.
22          No. 7, forfeiture, the United States agrees not to
23   pursue and will dismiss any motions related to the forfeiture
24   identified in the superseding indictment, to include the lot
25   and partial land, together with buildings, located at my

1 residence which are titled in my wife's name and I -- mine.

2          On April 9th, 2008, the U.S. Attorney's Office filed

3 a motion to dismiss the real property forfeiture allegation of

4 the second superseding indictment.

5          THE COURT:  And the only specific property listed in

6 that forfeiture provision was the house, to begin with, and

7 the property?

8          THE DEFENDANT:  That's correct, Your Honor.

9          THE COURT:  Okay.

10          THE DEFENDANT:  April 21st, I was given a sentence

11 of six months' imprisonment, which I followed -- served,

12 followed by a period of supervised release, 24 months,

13 including four months of home detention.

14          On June 11th, the time of supervised release was

15 shortened and terminated.

16          And this is, I guess, where we get into the -- where

17 I started inquiring.  On June 13, 2008, my attorney,

18 Rosenblum, wrote a letter to AUSA -- U.S. Attorney Stoddard

19 and -- where he addressed that.

20          On December of 2008, shortly after release from the

21 Bureau of Prisons, I contacted the FBI via telephone, inquired

22 about the procedures that I would have to take in order to

23 transfer possession and ownership of the property that was

24 received from me on June 9th, 2006.

25          I was told to submit a written letter explaining the

1   details, along with -- of the case, along with a bill of sale
2   and the contact information of the person to whom I wished the
3   property to go to.
4           On December 17th, I sent a letter to the agent in
5   charge of the FBI office in Jacksonville explaining the facts
6   of the case, and indicated on 12/1 that I had transferred
7   possession/ownership of the firearms to William Boggs, and
8   gave the contact information of both parties.
9           William Boggs was a -- or is my next-door neighbor.
10  I spoke with him about transferring ownership and purchasing
11  the weapons.  And he agreed on -- initially he agreed to do
12  so.
13          THE COURT:  How do you spell his last name?
14          THE DEFENDANT:  B-o-g-g-s.  I have a copy of that
15  letter.  And, also, I have a copy of the bill of sale.
16          THE COURT:  All right.  Now, that's a different
17  letter or bill of sale than listed in your renewed motion as
18  to Mr. Robert Rosier, right?
19          THE DEFENDANT:  That is correct, Your Honor.
20          THE COURT:  Okay.  Well, let's go ahead and get that
21  in the record too, then.
22          THE DEFENDANT:  Shortly after I submitted the letter
23  to the agent in charge of the FBI field office, they contacted
24  Mr. Boggs on or about January 24th, 2009, concerning taking
25  possession of the firearms.

1          Two days later, Mr. Boggs informed me that after

2    speaking with the FBI he didn't feel like he wanted to take

3    possession of the firearms, that he didn't want to purchase

4    them or become involved, so, therefore, the -- the bill of

5    sale was voided.

6          March 2nd, I sent a letter to the agent in charge of

7    the FBI field office in Jacksonville, Florida.  I explained

8    due to the fact that Mr. Boggs no longer wanted to take

9    possession of the firearms that I spoke with an acquaintance

10   and a friend, Mr. Robert Rosier, about taking possession of

11   the firearms.  And I have that letter that I sent, and also a

12   bill of sale.

13          THE COURT:  All right.

14          THE DEFENDANT:  April 6, I contact -- I sent a

15   letter to the agent in charge of the FBI field office and

16   asked the OIC, or the case agent, to please contact my wife or

17   Mr. Rosier and indicate when the property may be transferred.

18          On December 14th, 2009, I sent a letter -- another

19   letter to the OIC, field office, in Jacksonville, Florida,

20   indicated that I'd made several good-faith attempts to contact

21   the FBI and tried to transfer possession/ownership of the

22   firearms that were voluntarily turned over by myself on

23   June 9, 2006.

24          I also called several times -- April 22nd, 2009, at

25   1 p.m., I called the FBI and spoke with them -- and I didn't

get the agent's name.  The agent would not give his name -- or

their name -- trying to get information about if they could

contact reference to firearms.

April 30th, again, at 11 o'clock a.m., the agent

would not give the name.  May 13th, 2009, at 11 a.m., the

agent wouldn't give the name.  June 22nd, 2009, at 2:30 p.m.,

I spoke with an Agent Rusty, who said he -- they would get

someone to call me back.

December 14th, 2009, 11 a.m., I spoke with Agent

Eubanks, who informed me that they were aware of my request

and they would be contacting me.

I asked Agent Eubanks, How come -- how come it only

took three weeks for them to approve Mr. Boggs to take

possession of the firearms, but they were not allowing me to

turn them over to Mr. Rosier?  He said he didn't know.  But

they were trying to work out -- work with the U.S. Attorney's

Office regarding the situation.

I requested to speak with a supervisor and was

denied to speak with anyone else.  I have a copy of that

letter that was submitted on December 14th.

THE COURT:  Let me ask you one question right there.

You said you were under the impression that you had been

approved to turn the firearm -- or that Mr. Boggs had been

approved to receive the firearms from the FBI?

THE DEFENDANT:  That's what he told me.  But then he

1  called them back and said that he didn't want to.

2        THE COURT:  Did the FBI tell you that, or just

3  Mr. -- did Mr. Boggs?

4        THE DEFENDANT:  Mr. Boggs.  Mr. Boggs.  The FBI

5  wouldn't give me no information, Your Honor.

6        THE COURT:  All right.  And you'd never received

7  anything in writing indicating they had approved it for

8  Mr. Boggs?

9        THE DEFENDANT:  No.  No, Your Honor.

10        THE COURT:  Okay.

11        THE DEFENDANT:  June 5th of -- excuse me, Your

12  Honor.

13        January 5th, I received a letter from the FBI

14  indicating that an investigation was being conducted to the

15  merits of the claim.  That was the first correspondence --

16  written correspondence that I had ever received from them.

17        THE COURT:  That's 2010?

18        THE DEFENDANT:  Yes.  Let's see.  Yes, Your Honor.

19        THE COURT:  Okay.

20        THE DEFENDANT:  Yes.

21        THE COURT:  Do you have a copy of that letter?

22        THE DEFENDANT:  Did...

23        THE COURT:  Or was it attached to one of your

24  pleadings earlier?

25        THE DEFENDANT:  I think -- I think we did it -- was

1 it actually only on that, that last one?

2          THE COURT:  No.

3          THE DEFENDANT:  On December 16th, 2009, I received a

4 letter from the FBI indicating that on June 9th, 2006, the FBI

5 had seized the firearms and I had 30 days in order to submit a

6 claim for the property.  Instructions were given on how to

7 submit the claim for the property.

8          On December 28th, myself and Mr. -- Mr. Rosier and

9 myself submitted written claims indicating -- and including a

10 statement of facts and circumstances justifying the claim for

11 the property.

12          The claim was supported by documentary evidence

13 establishing valid good-faith interest in the property,

14 attached a bill of sale, along with a settlement agreement

15 that I offered the FBI.

16          This is a copy of my submission.  And I also have a

17 copy of Mr. Rosier's submission.

18          January the 5th, 2010, I received a letter from the

19 FBI indicating that an investigation was being conducted into

20 the merits of my claim.  And May 21st, 2010, Mr. Rosier and

21 myself received a letter indicating that the claim had been

22 denied; again, a copy of the denial received by myself and by

23 Mr. Rosier.

24          June 3rd, 2010, I requested a reconsideration on the

25 decision.

1          THE COURT:  Mr. Henderson, these -- this Exhibit

2  No. 11, the letter dated -- the certified letter to you from

3  the FBI, dated May 21st -- one looks like a mailed copy and

4  one a faxed copy of the same thing.

5          Go ahead and hand that back and let him look at

6  those.  We would just need to...

7          COURTROOM DEPUTY:  Am I marking this as one exhibit,

8  or two?

9          THE COURT:  Well, we probably don't need both of

10 them if they are the same, indeed.  We'll take the letter

11 instead.

12         MR. STODDARD:  Actually, Your Honor, I believe --

13         THE DEFENDANT:  One is to Mr. Rosier and one is to

14 myself.

15         MR. STODDARD:  -- one of -- one of them is addressed

16 to Mr. Rosier.

17         THE COURT:  Oh, okay.  All right.

18         MR. STODDARD:  And the other one is addressed to

19 Mr. Henderson.

20         THE COURT:  We can mark them as 11A and B, if you

21 want to, if that's easier.

22         (Judge confers with courtroom deputy.)

23         THE COURT:  All right.  We'll make it 11 and 12,

24 then.  Okay.

25         THE DEFENDANT:  June 3rd, I requested a

reconsideration -- requested a reconsideration on the decision. And, on January 26th, I received a letter from the FBI indicating that the reconsideration was denied.

I feel that the FBI's response to my administrative request for return of my property to a person entitled to legally possess firearms under state and federal law -- the response of the denial was based on my abandonment of the property, citing 41, C.F.R., 128-48.502.

The agency has failed to follow its own procedures relating to notifying me that the property was seized under 41 C.F.R. 128-48.102-1(b).

According to the FBI's seizure letter -- seizure letter, dated December 16th, 2009, I was advised that the property was seized on June 9th, 2006.

The notice of the seizure was received three years, six months and seven days after the property was received from me.

My question is: What would be the legal basis for the seizure? And how could the property be seized prior to my plea agreement on November 30th and my sentencing on April 21st, 2008? And there would be no probable cause for seizure.

On January 21st, 2011, Agent Stoddard received -- or, excuse me, U.S. Attorney Stoddard -- Mr. Stoddard received a letter from the FBI indicating that on December 2009 the FBI initiated an abandonment process to resolve the disposition of

the number of weapons that were seized pursuant to my arrest

on -- 2006.

Again, there was -- there would be no probable cause

for -- for a seizure at that time.  I was merely under

indictment.  I have a copy of that letter.

THE COURT:  Yes, please.

THE DEFENDANT:  I'd like to make the following

points in the case, Your Honor.

THE COURT:  All right.

THE DEFENDANT:  The firearms have been owned by my

family and me for many years.  Many were given to me by

inheritance, trading and buying from family members, friends,

co-workers and other law enforcement officers.

I was a border patrol agent for 22 years, involved

in law enforcement.  The firearms were not illegally possessed

at the time that I had them in my possession.  None of the

weapons were prohibited or illegally altered and none of them

reported lost and stolen.

My conviction was totally unrelated to the surrender

of the firearms.  The firearms were voluntarily turned over to

the FBI for safekeeping, like I said, and as a condition of

the bond.  The firearms are no longer held as a condition of

the bond.

The firearms were not acquired by any administrative

process or any court order.  I was never advised that by

1 voluntarily turning them over it would render them abandoned

2 or seized.

3       The firearms were never found to be involved in any

4 criminal activity, nor were they ever determined to have been

5 purchased from proceeds from any criminal activity, nor were

6 they ever used to facilitate the commission of any crime.

7       The firearms at issue do not constitute contraband,

8 fruits of a crime, and are not subject to forfeiture or

9 seizure.  There is no basis for the seizure of the firearms.

10       I still hold legal title to the property at issue

11 because a transfer of title cannot be completed by Mr. Rosier.

12 And I acquired title before the government alleged any

13 criminal activity.

14       The firearms were never seized, forfeited,

15 abandoned, or considered unclaimed personal property, nor were

16 they ever used as evidence in any other criminal case.

17       There was no probable cause for any seizure, nor

18 there's any belief that the property was ever used unlawfully.

19       Mr. Rosenblum contacted the U.S. Attorney's Office

20 in -- June 22nd of 2008.  I contacted the FBI six times by

21 telephone and wrote three letters prior to receiving the first

22 correspondence from the FBI of a notice of seizure, December

23 2009.

24       For this reason, I feel how can they be considered

25 abandoned?  I was not given notice within the time frame

1  required by law that the firearms were considered seized.  No

2  notice or seizure was ever provided -- they never provided

3  any -- citing any statute under which the firearms were

4  seized.  There was no forfeiture provision or plea agreement

5  where I agreed to forfeit any assets.  The firearms were not

6  involved as part of any search or seizure.

7          And I'd like to make this perfectly clear, Your

8  Honor.  I do understand that by being a convicted felon that I

9  cannot own or possess a firearm.  I do understand that.

10          Since my wife can legally own and is lawfully

11  entitled to the firearms, I respectfully request that my

12  spouse, who is present, Linda Henderson, be given possession

13  of, title, and control of the firearms collection for the

14  benefit of my adult children and heirs.

15          In the alternative, I respectfully request that the

16  court take jurisdiction over this issue and render a final

17  decision and a request to transfer my non-possessory interests

18  and issue Mr. Robert Rosier ownership, title, and possession,

19  or any other person of my choosing who is lawfully entitled to

20  own subject firearm collection.

21          And that concludes my...

22          THE COURT:  Mr. Henderson, are you still on

23  supervised release?

24          THE DEFENDANT:  No, I'm not, Your Honor.

25          THE COURT:  And can you identify who Mr. Rosier is?

1  Is he a neighbor?  Where does he live?  What's --

2  THE DEFENDANT:  Mr. Rosier lives in St. Augustine,

3  Florida.  I met him in -- can I look at my notes, Your Honor?

4  THE COURT:  Yes.

5  THE DEFENDANT:  I met him on -- about March 4th,

6  through some -- a highway patrol friend of mine in a camping

7  group that I was involved in, a little camping -- my wife and

8  I joined a camping club.  And it was acquaintance to them.  He

9  lives in St. Augustine, Florida.

10  THE COURT:  And, to your knowledge, he has no felony

11  convictions?

12  THE DEFENDANT:  That is correct, Your Honor.  And...

13  THE COURT:  Is he a firearms dealer?

14  THE DEFENDANT:  No, he's not, Your Honor.  He's a

15  private citizen, early 70s, grandchildren, family man.

16  THE COURT:  The bill of sale you presented does not

17  indicate he paid you anything for the firearms.

18  THE DEFENDANT:  That is correct, Your Honor.  He was

19  going to get the firearms, look the firearms over, if he felt

20  like he needed to have an appraisal or -- go from there, and

21  then we would decide on what would be transferred, as far as

22  funds.

23  THE COURT:  Mr. Stoddard, do you have any questions?

24  MR. STODDARD:  I do.

25  **CROSS-EXAMINATION**

1 BY MR. STODDARD:

2 Q.     Mr. Henderson, according to the letter that you sent

3 the FBI on December -- dated December 14th, 2009, the first

4 attempt that you made to transfer possession of these weapons

5 was on December 1st of 2008; is that correct?

6 A.     No.  The first attempt was made by Mr. Rosenblum.

7 Q.     I'm asking your first attempt.  That was on --

8 according to your letter, that was on December 1st, 2008?

9 A.     According to my letter, that's correct.

10 Q.     And that would have been to Mr. Boggs?

11 A.     Yes.

12 Q.     And, for whatever reason, Mr. Boggs decided he didn't

13 want the firearms; is that right?

14 A.     That's correct.

15 Q.     And so your next attempt would have been on --

16 approximately a little over -- a month later, on December --

17 excuse me, on December 26th -- or, I'm sorry, on February 4th,

18 2009, was when you contacted Mr. Rosier about your firearms;

19 is that correct?

20 A.     Yes.

21 Q.     So you've made two attempts to transfer ownership of

22 these firearms, once in 2008 and once in 2009; is that

23 correct?

24 A.     Yes.

25 Q.     Now, did you make any attempt to transfer possession of

1  these firearms prior to December 6th of 2007?

2  A.    Wasn't that when I was -- turned them over?

3  Q.    I don't believe so.

4       THE COURT:  No.  December 6th, 2007, is when you

5  were adjudicated guilty.

6  BY MR. STODDARD:

7  Q.    That was when you were adjudicated guilty.  Did you

8  make any attempt to transfer ownership prior to December 6th,

9  2007?

10 A.    No.

11 Q.    Did you make any attempt to transfer ownership prior to

12 April 24th, 2008?

13 A.    What was the date?

14 Q.    April 24th, 2008, the day you were sentenced.

15 A.    No, I did not.

16 Q.    So any attempt that you've made to transfer ownership

17 of these firearms has occurred since you have been convicted

18 of a felony; is that correct?

19 A.    That's correct.

20 Q.    I have no more questions.

21 A.    Okay.

22       THE COURT:  All right.

23       All right.  Anything else you wish to testify to,

24 Mr. Henderson?

25       I'll have argument.  And I may hear if the United

1  States has some evidence they wish to present, but...

2          THE DEFENDANT:  Not at this time, Your Honor.

3          THE COURT:  All right.  You may step back down to

4  the table.  Thank you.

5          And any objection to -- I think I've got Exhibits 1

6  through 15 -- Defendant's Exhibits 1 through 15.

7          Any objection to those?

8          MR. STODDARD:  No objections, Your Honor.

9          THE COURT:  All right.  They will be admitted into

10 evidence.

11         (Defendant's Exhibit Nos. 1 through 15 were received

12 into evidence.)

13         THE COURT:  Mr. Stoddard -- again, you have no other

14 witnesses you wish to call, Mr. Henderson?

15         THE DEFENDANT:  No, I do not, Your Honor.

16         THE COURT:  Okay.  Mr. Stoddard, do you have any

17 evidence you wish to present?

18         MR. STODDARD:  No, Your Honor.  We would rely on the

19 previous memorandum that's been submitted by the government.

20         THE COURT:  I would like you to address, first, the

21 point Mr. Henderson raised about the FBI perhaps not following

22 its own procedures under 41 C.F.R., because they did not seize

23 the weapons until -- or they did not send him a letter of

24 notice of seizure, if that's, indeed, what it was to be

25 called -- and under 128, slash -- C.F.R. -- 41 C.F.R., Section

1  128-48.1, and that -- which concerns abandoned property rather
2  than seized property.

3  　　　　It does seem like it's to be -- notify within 20
4  days of finding such property.  This property was never lost
5  exactly, but...

6  　　　　MR. STODDARD:  Well, the government's position would
7  be that Mr. Henderson received actual notice of the seizure on
8  June the 9th, 2006, when the FBI came to his house and took
9  possession of the firearms and maintained possession of those
10 firearms up through and during the time of the pendency of the
11 charges, the adjudication of guilt, and the conviction.

12 　　　　THE COURT:  All right.  The -- but the form that --
13 I think Ms. Pellicciotti signed as receiving them, lists --
14 there's four boxes on it, received from, returned to, released
15 to, or seized.  And that says received from.  It does not
16 check seized.

17 　　　　MR. STODDARD:  It does say received from, Your
18 Honor.  That is correct.

19 　　　　THE COURT:  I mean, is there any magic about how
20 December of -- or January of 2009 was chosen for that letter?

21 　　　　MR. STODDARD:  I do not know what generated the
22 letter.  I think perhaps just the fact that the weapons were
23 still there, that there needed to be some final adjudication
24 before the weapons could be disposed of by the FBI, would be
25 my -- and that's just a guess on my part.

1          THE COURT:  The other question I have is under the

2 C.F.R., Title 41, procedures -- it does have, of course, the

3 procedure which Mr. Henderson exercised to appeal the initial

4 denial.

5          But is there anything in the C.F.R., to your

6 knowledge, that then follows up with a procedure to seek court

7 relief?

8          MR. STODDARD:  None that I'm aware of, Your Honor,

9 other than what would typically be available to someone

10 appealing an administrative action by an executive agency.

11          THE COURT:  Do you know what that is?

12          MR. STODDARD:  I do not.

13          THE COURT:  Okay.  And these firearms are still

14 maintained in Jacksonville?

15          MR. STODDARD:  The firearms are still in

16 Jacksonville.  Nothing has been done to dispose of them.

17          THE COURT:  Okay.  All right.  I'll hear the other

18 argument, or whatever else you wish to present.

19          MR. STODDARD:  Very simply, Your Honor, that after

20 Mr. Henderson was adjudicated guilty in 2008 that he lost all

21 rights to do anything with respect to the transfer of these

22 weapons.  By doing so, he would have been exercising

23 constructive possession of the weapons.

24          And as a convicted felon, constructive possession

25 would be an additional felony.  And he's prohibited by law

1  from doing so.

2  And he can't seek the court's help or assistance in

3  committing what otherwise would be a felony.  And that at that

4  point any attempts he had made prior to the adjudication of

5  guilt and the sentencing, I think would have -- could have --

6  certainly would have merit.

7  But anything done post conviction doesn't, because

8  he's -- he's not -- he doesn't sit in a position to be able to

9  do anything with respect to ownership of the firearms.

10  THE COURT:  All right.  Mr. Henderson, do you have

11  any reply to that?

12  THE DEFENDANT:  Your Honor, it's recognized that

13  there have been -- a split decision in the circuit courts over

14  whether it's possible for the government to retain possession

15  of firearms following a criminal conviction without initiating

16  formal forfeiture proceedings.

17  However, several circuits have held it that

18  forfeiture is barred by failure to commence action within

19  appropriate time frame and the owner stands as a convicted

20  felon.

21  The owner continues to have a property interest in

22  the firearms, which must be accommodated by the sale,

23  transfer, or storage of the firearms, despite its own

24  possessory right of having it curtailed, *U.S. versus Miller*,

25  588, and *Watts versus United States*, 2002.

1          Directly on point is the more recent case, Your

2    Honor, of *U.S. versus Brown*, and reference a claim for

3    Bernhard Bastian, Jr., April 9th, 2010, where the facts are

4    virtually identical to the facts of my case.

5          In *Brown*, the judge issued an order stating that the

6    weapons surrendered by the defendant as a bail condition are

7    no longer being held as a bail condition and the defendant

8    violated his bail and is convicted and sentenced.  That may be

9    transferred by the defendant to anyone who may legally possess

10   them.

11         Moreover, the disposition of property held as a

12   convicted -- condition of the bail is a matter falling well

13   within the court's jurisdiction.

14         The court rejected the proposition that the firearms

15   lawfully owned must fall in the owner's unrelated felony

16   condition -- conviction, except where they may be unable and

17   wasting, not subject to forfeiture and not subject to

18   confiscation as contraband, and not subject to disposition by

19   the owner or anyone else, or by the court for the owner's

20   benefit.

21         The court further rejected that such property is

22   subject to government confiscation and destruction in the

23   absence of due process of payment or just compensation.

24         The remedy fashioned by the *Brown* court and the

25   judge that exercised equitable powers and ordered that the

transfer and title of the firearms lawfully owned but later
convicted of a felony were not -- not subject to forfeiture or
confiscation as contraband for a felony owner's benefit.

The courts have fashioned solutions that preclude
convicted felons from unilaterally dictating or directing, get
possession of their unlawfully owned firearms while avoiding
serious constitutional issues under the Takings Clause while
protecting the felon owner's legitimate property interest.

And, Your Honor, I'm here pro se.  I'm not an
attorney.  So that's -- I presented the facts of the case and
everything I have in this.  And that's the best I can do.

THE COURT:  All right.  Thank you, Mr. Henderson.

Mr. Stoddard, anything else?

MR. STODDARD:  Nothing further from the United
States.

THE COURT:  I'm going to take some time, because I
want to be able to look at these exhibits more carefully.
The -- there clearly is a split in authority, Mr. Henderson.
I'll go ahead and point this out.

And as Mr. Stoddard cited, the *Howell* case in the
Eleventh Circuit, which is, as you probably know, the circuit
that we're under here in Jacksonville -- and the *Howell* case
clearly says that a convicted felon cannot either take a
return of the weapons, and also was not entitled to
constructive possession of the weapons in the form of a trust,

1  or to be able to get the sale or distribution of the proceeds

2  for the weapons should they be sold.

3            So that's -- that case is binding on this court.  I

4  will note that in that action the Eleventh Circuit, as some

5  other circuits, have indicated that a proper procedure perhaps

6  to get damages, if you believe they were unjustly taken from

7  you, would be under 42, U.S. Code, Section 1983.

8            That's in a footnote in the *Howell* case that we --

9  the Eleventh Circuit expressed no opinion on whether you may

10 file an action under that -- that statute.  Other circuits

11 have indicated that would be appropriate.

12           However, in -- the *Brown* case, as you said, is

13 probably the only other case I've seen where the firearms

14 initially were surrendered as a condition of bail, which is

15 different than most of the cases involving firearms.

16           But they still clash at some point once you become

17 adjudicated guilty and were sentenced.  That's where the

18 problem comes in.

19           Under *Brown*, the -- you're correct.  The way I read

20 that case, you might be able to get the benefit of it.  But

21 that's not the Eleventh Circuit case, unfortunately.

22           On the other hand, the Eleventh Circuit perhaps has

23 never faced this exact issue.  So if I do rule against you,

24 you could either appeal to the Eleventh Circuit or you could

25 consider filing a separate action under 42, U.S. Code, Section

1    1983.

2           But I do want to digest the documents, the various

3    letters, and the attachments to those, as well.  Frankly, I

4    don't find the C.F.R. procedures adequate in a case like this.

5    And they don't really address the situation directly.

6           I, frankly, cannot consider these ever abandoned,

7    given the circumstances which they were given and the fact

8    that he contacted the court -- or, I mean, the FBI, rather, as

9    early as 2008, while still serving as -- his sentence.

10           It would have been better had you tried to transfer

11    ownership prior to being adjudicated in the case.  But I

12    understand you had other things on your mind at that point,

13    probably, as well.

14           THE DEFENDANT:  That's correct.

15           THE COURT:  And it's a little bit unusual -- it's

16    not unheard of, clearly, but to have these firearms

17    surrendered to the -- into the agency as a condition of

18    bond -- I've had cases where they've been released to some

19    other person or placed in a gun safe, someplace like that,

20    but -- so this is a different fact situation than most of

21    these cases.

22           So I will read these and get an order out as soon as

23    possible on it.  I do appreciate the research you've done,

24    Mr. Henderson.  You -- as a pro se person, you've --

25           THE DEFENDANT:  Thank you, Your Honor.

1          THE COURT:  -- thoroughly spent some time on it and
2    devoted to it.  And I understand that.

3          On the other hand, again, as I mentioned, I am faced
4    with the Eleventh Circuit law and have to follow that.  So
5    we'll -- we'll compare the two and see how they come out and
6    get an order out as soon as we can.

7          Anything else we can take up on this today?

8          MR. STODDARD:  Nothing further from the United
9    States.

10          THE DEFENDANT:  Nothing personal, Your Honor.

11          THE COURT:  All right.  Thank you.  We'll be in
12    recess.

13          COURT SECURITY OFFICER:  All rise.  This Honorable
14    Court is now in recess.

15          (The digitally recorded proceedings concluded at
16    3:00 p.m.)

17                                    - - -

18

19

20

21

22

23

24

25

## **CERTIFICATE**

 UNITED STATES DISTRICT COURT     )
                                  )
 MIDDLE DISTRICT OF FLORIDA       )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


       DATED this 12th day of August 2013.



       s/Shannon M. Bishop
       Shannon M. Bishop, RMR, CRR